SO ORDERED,

Judge Neil P. Olack
United States Bankruptcy Judge
Date Signed: January 23, 2020

**The Order of the Court is set forth below. The docket reflects the date entered.**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

GREAT SOUTHERN GOLF CLUB, INC.,                    CASE NO. 19-51282-NPO

DEBTOR.                                                                  CHAPTER 11

### MEMORANDUM OPINION AND ORDER
### DENYING MOTION FOR RELIEF FROM THE
### AUTOMATIC STAY FILED BY GREAT SOUTHERN INVESTMENTS, INC.

This matter came before the Court for hearing on January 8, 2020 (the "Hearing"), on the Motion for Relief from the Automatic Stay Filed by Great Southern Investments, Inc. (the "Stay Motion") (Dkt. 60) filed by Great Southern Investments, Inc. (the "Creditor")[1] and the Answer to Motion for Relief from Automatic Stay Filed by Great Southern Investments, Inc. (the "Response") (Dkt. 75) filed by the debtor-in-possession, Great Southern Golf Club, Inc. (the "DIP") in the above-referenced bankruptcy case (the "Bankruptcy Case"). At the Hearing, J. Walter Newman, IV ("Newman") represented the Creditor and Robert A. Byrd represented the DIP. Everette E. Ladner, III ("Ladner") testified on behalf of the Creditor as a Mississippi-certified real estate appraiser and the Creditor offered Ladner's written report ("Ladner's 2019 Report")

---

[1] At the Hearing, the Court referred to Great Southern Investments, Inc. as the Movant. To be consistent with other Opinions and Orders of the Court, Great Southern Investments, Inc. will be referred to as the Creditor.

into evidence without objection.[2]  Stacy R. Breland ("Breland") testified on behalf of the DIP as a Mississippi-certified real estate appraiser and the DIP offered Breland's written report ("Breland's Report") into evidence without objection.  Both witnesses qualified as experts.  The DIP also offered Ellis Hill's ("Hill") oral testimony, a Site Description (DIP Ex. 1), and a 2013 Summary Appraisal Report ("Ladner's 2013 Report") (DIP Ex. 2) into evidence.[3]  The parties jointly entered the Stipulation of facts (the "Stipulation").  (Stipulation at 1).  The Court denied the Stay Motion from the bench, and this Opinion memorializes and supplements the Court's bench ruling.[4]

## Jurisdiction

This Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (G).  Notice of the Hearing was proper under the circumstances.

## Procedural History

On July 3, 2019, the DIP filed a voluntary petition for relief (the "Petition") (Dkt. 1) under chapter 11 of the U.S. Bankruptcy Code (the "Code").[5]  On the Petition, the DIP designated its business as a "Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))" case.  (Dkt. 1 at 2).

---

[2] Hereinafter, the appraisal report introduced into evidence at the Hearing by the Creditor is cited as "(L. Appr. __)"; the appraisal report introduced into evidence at the Hearing by the DIP is cited as "(B. Appr. __)"; the Stipulation (Dkt. 94) jointly introduced into evidence at the Hearing is cited as "(Stipulation ___)"; and exhibits introduced into evidence at the Hearing by the DIP are cited as "(DIP Ex. ___)".

[3] Ladner's 2013 Report is not paginated.  The Court cites to the page numbers of Ladner's 2013 Report as if it were paginated, with the cover page designated as page one (1).

[4] The Court makes the following findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[5] Hereinafter, all code sections refer to the Code found at Title 11 of the United States Code, unless otherwise noted.

On August 5, 2019, Newman filed a notice of appearance on behalf of the Creditor in the Bankruptcy Case. (Dkt. 34).

On August 16, 2019, the Court signed the Agreed Scheduling Order (the "Agreed Scheduling Order") (Dkt. 40) that extended the deadline for the DIP to file a disclosure statement and a confirmable plan of reorganization from October 1, 2019 to October 31, 2019. (Dkt. 40 at 2). The Creditor did not take any action with respect to the Agreed Scheduling Order.

The Creditor filed the Stay Motion on October 30, 2019 (Dk. 60). In the Stay Motion, the Creditor asserts that it holds a claim against the DIP of approximately $4 million secured by the DIP's property and seeks relief under "11 U.S.C. § 362 and Bankruptcy Rules 7001 et. [sic] seq. and 9001 et. [sic] seq." (*Id.* at 1). The Creditor states that cause exists to grant the Stay Motion because "the collateral is diminishing and what little equity cushion existed as of the filing date has been lost." (*Id.*). The Creditor further asserts that the DIP "has no equity in the property and said property is not necessary for an effective reorganization." (*Id.*). In the Stay Motion, the Creditor also argues that the DIP has "failed to file a reasonable plan of reorganization within 90 days of the filing of the [Original Petition] and the Court did not extend the time to file during the 90 day period" and that "[t]here is no feasible plan the [DIP] can file that has a likelihood of being confirmed." (*Id.* at 2). In addition, the Creditor alleges that the DIP failed to commence the monthly payments required of "single asset real estate" debtors by § 362(d)(3). (*Id.* at 1).

On October 31, 2019, the DIP filed the Disclosure Statement (Dkt. 66) and the Plan of Reorganization (the "Proposed Plan") (Dkt. 67) within the deadline set forth in the Agreed Scheduling Order. On November 26, 2019, the DIP filed the Response generally denying that that the Stay Motion should be granted, and specifically arguing that § 362(d)(3) did not apply. The DIP also filed on the same day an amended Voluntary Petition for Non Individuals Filing for

Bankruptcy (Dkt. 74), removing the "Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))" designation. (*Id.* at 2).

During the telephonic hearing on December 3, 2019, counsel for the DIP argued that the Stay Motion did not cite § 362(d)(2), and, therefore, the pleading was insufficient to proceed under that Code section or any other statutory provision except § 362(d)(3). The Court ruled that the averments in paragraphs two and three of the Stay Motion tracked language in § 362(d)(2) not found in § 362(d)(3) and were sufficient to allow the Creditor to proceed also under § 362(d)(2). The Court then instructed the parties to file briefs on the purely legal issue raised in the Stay Motion and the Response of the applicability of § 362(d)(3).

In the Order Denying in Part the Motion for Relief from the Automatic Stay Filed by Great Southern Investments, Inc. (the "Order") (Dkt. 97) signed on December 16, 2019, the Court denied the Creditor's request for relief under § 362(d)(3). The Order set the remaining issues, the issues currently pending before this Court, for the Hearing.

## Facts

The DIP owns an approximately 129-acre parcel of property (the "Subject Property") located at 2000 Beach Boulevard in Gulfport, Mississippi comprised of two (2) tracts. (Dkt. 66 at 14). The Subject Property has been utilized as a golf course with a 5,000 square-foot clubhouse containing a bar and grill and a golf pro shop. (*Id.* at 15). The DIP's operation provides: golf course memberships, general public passes to play golf, golf cart rentals, a golf pro shop that sells merchandise, meeting room facilities for rental, a bar where alcoholic and non-alcoholic beverages and snacks are available for purchase, and a grill with meals available for purchase. (Dkt. 75 at 3).

Post Hurricane Katrina,[6] the DIP's business was funded with debt.  (Stipulation ¶ 2).  In September 2012, Great Southern Investments, Inc., comprised mostly of the DIP's stockholders, "was formed to assume the $2.1 million debt/mortgage from BancorpSouth" with an interest-only payment schedule and a three (3)-year balloon note (the "2012 Note").  (Stipulation ¶ 2).  In August of 2015, the 2012 Note was paid off by Great Southern Investments of MS, LLC with a new loan (the "2015 Note") in the amount of $2,500,000.00 with interest-only payments until the 2015 Note's maturity date in August of 2017.  (Stipulation ¶ 3).  In May of 2017, the 2015 Note was paid off by a new loan in the amount of $3,000,000.00 (the "2017 Note") from the Creditor.  (Stipulation ¶ 4).  The terms of the 2017 Note deferred payment until it matured in May of 2019.  (Stipulation ¶ 4).  The 2017 Note is the loan at issue in the Stay Motion.

The DIP listed the Subject Property for sale on a multiple listing service on May 1, 2016 with an original asking price of $9,500,000.00.  (Stipulation ¶ 6).  In May of 2018, the DIP reduced the asking price to $7,500,000.00, and the listing expired in May of 2019.  (Stipulation ¶ 6).  After the Petition was filed, the Court granted the DIP's Motion to Retain Real Estate Broker (Dkt. 51).  The DIP retained Coldwell Banker Commercial Alfonso Realty on a non-exclusive basis with a commission of six percent (6%) of the sale price until October 31, 2019.  (Dkt. 36 at 4).  The Subject Property is currently listed for sale on LoopNet[7] for $7,500,000.00.  (B. Appr. at 8).

The 2017 Note was not paid by the May 2019 maturity date, and, after several informal extensions to pay the 2017 Note, the Creditor began foreclosure proceedings in June of 2019.  (Stipulation ¶ 7).  The Creditor scheduled the foreclosure for July 9, 2019.  (Stipulation ¶ 7).

---

[6] Hurricane Katrina was a Category 3 hurricane that made landfall in southeast Louisiana and along the Mississippi Gulf Coast in August of 2005.

[7] LoopNet is an online listing service for the sale or lease of commercial real estate.

On July 3, 2019, the DIP filed the Original Petition, and the Creditor terminated the foreclosure. The schedules (Dkt. 28) indicate that the DIP has an interest in the Subject Property valued at $6,950,000.00. (Dkt. 28 at 5). Schedule D: Creditors Who Have Claims Secured by Property ("Schedule D") lists a deed of trust in the amount of $226,026.76 (the "Hill Deed of Trust") held by Hill and a deed of trust in the amount of $3,600,000.00 (the "Creditor Deed of Trust") held by the Creditor. (Dkt. 28 at 8-9).

In the Proposed Plan, the DIP intends to restructure the debt or liquidate the DIP's assets for the benefit of all creditors. (Dkt. 67 at 9). The DIP believes that moving forward with the Proposed Plan is the best way to maximize the potential value of the DIP's assets and the return to creditors. (Dkt. 67 at 17). In the Proposed Plan, the DIP requests a twelve (12)-month period to pursue either a sale of all or a portion of the Subject Property and/or negotiations with investor groups willing to develop a portion of the Subject Property. (Dkt. 67 at 11-12).

The parties stipulated to the amounts encumbering the Subject Property. (Stipulation ¶¶ 12-15). The Creditor's principal amount of debt is $3,000,000.00 with interest accruing at a rate of twelve percent (12%) per annum. (Stipulation ¶ 15). As of November 26, 2019, the unpaid and accrued interest was $938,108.19. (Stipulation ¶ 15). In 2019, the DIP failed to pay the 2018 real property taxes in the amount of $16,704.57, and the Creditor paid the expense. (Stipulation ¶ 15). The parties stipulated the Creditor is also entitled to legal fees that continue to accrue but were $16,195.83 as of November 26, 2019. (Stipulation ¶ 15). The Creditor filed a proof of claim in the Bankruptcy Case in the amount of $4,000,234.98 on October 17, 2019. (Cl. #4-1). The stipulation states that as of November 26, 2019, the DIP owes the Creditor $4,016,008.59 with interest and legal fees continuing to accrue. (Stipulation ¶ 15). The Hill Deed of Trust was recorded on April 8, 2019 and has an approximate balance of $226,026.00 with interest accruing

at eight percent (8%) per annum.[8]  (Stipulation ¶ 12).  For purposes of the equity analysis under § 362(d)(2)(A), the Court relies on the parties' stipulated figures.[9]  The parties did not provide the Court with any other evidence or arguments to calculate the debt other than the Stipulation.  At this early stage of the proceedings, there should be no appreciable difference in this calculation.

At the Hearing, each party presented the testimony of a Mississippi-certified real estate appraiser as to the valuation of the Subject Property.  Both witnesses qualified as experts for valuing the Subject Property.

Both appraisers generally agree on the physical description of the Subject Property.  The Subject Property is comprised of a 50.59-acre southern parcel (the "Southern Parcel") and a 79.17-acre northern parcel (the "Northern Parcel") divided by railroad tracks.  (L. Appr. at 18).  The Northern Parcel is zoned R-2, Single-Family Residential District, Medium Density, and the

---

[8] Currently, the DIP scheduled the Hill Deed of Trust on Schedule D in the amount of $226,026.76 incurred on February 8, 2019.  (Dkt. 28 at 8).  The maturity date is scheduled as May 11, 2019.  Hill has not filed a proof of claim or taken any other action on the Hill Deed of Trust.  The parties' stipulated that the Hill Deed of Trust, recorded on April 8, 2019, has a value of $226,026.00.  (Stipulation ¶ 12).  The Court relies on the parties' Stipulation for purposes of the equity analysis, which encumbers the Subject Property with both the Hill Deed of Trust and the Creditor Deed of Trust.  The Court does not make any findings of fact or conclusions of law on the validity, enforceability, or avoidability of the Hill Deed of Trust.

[9] Adopting a flexible approach to § 506(b), the Fifth Circuit has recognized that even though a secured creditor may be undersecured as of the petition date, where the collateral's value is increasing and/or the creditor's allowed claim has been or is being reduced by cash collateral payments, the creditor may, at some time postpetition, become oversecured.  It is only at that point in time where the creditor's claim becomes oversecured that its entitlement to accrue interest, fees, and costs under § 506(b) is triggered.  Therefore, valuation of the collateral and a creditor's claim should be flexible and not limited to a single point in time.  *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 798 (5th Cir. 1997).  It is appropriate, in the context of a motion seeking relief from the automatic stay, to value the property subject to the creditor's claim and the creditor's claim as of the date of the hearing.  The hearing date provides the best approximation of the debtor's equity in the property that exists to protect the creditor's interest.  *In re Deep River Warehouse, Inc.*, No. 04-52749, 2005 WL 1287987, at *8 (Bankr. M.D.N.C. Mar. 14, 2005); *see In re Greenville Auto Mall, Inc.*, 278 B.R. 414, 421-22 (Bankr. N.D. Miss. 2001).

Southern Parcel is zoned R-1-7.5, Single-Family Residential District, Low Density.  (B. Appr. at 46).  The Subject Property includes 945 feet of road frontage along the north side of Beach Drive.  (B. Appr. at 26).  The Subject Property also has 880 feet of beach frontage and views of the Gulf of Mexico.  (Dkt. 67 at 7).  There are two entrances to the Subject Property from Beach Drive; however, Breland's Report suggests a potential easement from Debuys Road, not recorded on the tax maps or in the legal description, and an additional access easement located at the western property boundary of the Southern Parcel off Southern Circle.  (B. Appr. at 26).

## A.    Ladner's 2013 and 2019 Valuations

### 1.    Ladner's $13,140,000.00 Valuation in 2013

Without objection, the DIP introduced into evidence Ladner's 2013 Report.  (DIP Ex. 2). In 2013, the DIP employed Ladner to appraise the Subject Property and provide "a supportable estimate of market value to the Great Southern Golf Club."  (DIP Ex. 2 at 5).  Ladner concluded that the market value of the fee simple estate in the Subject Property, as of February 12, 2013, was $13,140,000.00.[10]  (DIP Ex. 2 at 5).  Ladner's 2013 Report is only a summary of the appraisal report and appears to be incomplete.  The letter introducing Ladner's 2013 Report demonstrates that Ladner segmented the Subject Property into three (3) tracts and valued the tracts as follows:

| | |
|---|---|
| Beach Development Parcel (15.00 Acres) | $ 7,840,000 ($12.00/SF) |
| Multi-Family Portion (35.59 Acres) | $ 3,320,000 ($93,300/AC) |
| Single Family Res. Portion (79.17 Acres) | $ 1,980,000 ($25,000/AC) |
| Total | $13,140,000 |

(DIP Ex. 2 at 6).  Although Ladner's 2013 Report is incomplete, Ladner confirmed the authenticity of the document and his signature.  (Test. of Ladner at 9:52:14-9:53:50 (Jan. 8, 2020)).[11]

---

[10]  At the time of Ladner's 2013 Report, the clubhouse was under construction and, therefore, was not included in the valuation.  (DIP Ex. 2 at 9).

[11]  The Hearing was not transcribed.  The citation is to the timestamp of the audio recording.

   2.      **Ladner's $3,890,000.00 Valuation in 2019**

For Ladner's 2019 appraisal of the Subject Property, he conducted an "internal, drive-by inspection only" in October of 2019. (Test. of Ladner at 9:43:14-9:43: (Jan. 8, 2020)). Ladner implemented the sales comparison approach to determine that the value of the Subject Property, based on the highest and best use, as of October 18, 2019, was $3,890,000.00. (L. Appr. at 2). Ladner determined that the highest and best use of the Subject Property for the analysis was as an approximately 129-acre residential single-family subdivision. (L. Appr. at 33). Ladner's 2019 Report explains, "In the sales comparison approach, value is indicated by recent sales and/or listings of comparable properties in the market, with the appraiser analyzing the impact of material differences in both economic and physical elements between the subject and the comparables." (L. Appr. at 4-5).

For his analysis, Ladner selected seven (7) properties located in Gulfport, Biloxi, and Ocean Springs that sold between June of 2016 and May of 2019. (L. Appr. at 35). The properties varied in size, price, location, and zoning as follows:



**Land Sales Summary**

| Comp. No. | Date of Sale | Usable Acres | Location | | Zoning | Proposed Use | Sales Price Actual |
|---|---|---|---|---|---|---|---|
| 1 | May-19 | 20.550 | SS of Pass Road | Biloxi, Mississippi | NB | Speculation | $525,000 |
| 2 | January-19 | 11.417 | Old Highway 67 | Biloxi, Mississippi | RS-7.5 | Residential Subdivision | $200,000 |
| 3 | October-17 | 13.630 | Money Farm Road | Ocean Springs, Mississippi | R-1A | Residential Subdivision | $230,000 |
| 4 | June-17 | 26.410 | 13151 Old Highway 67 | Biloxi, Mississippi | NB | Residential Subdivision | $668,000 |
| 5 | April-17 | 17.380 | 17072 Landon Road | Gulfport, Mississippi | R-1 | Residential Subdivision | $625,000 |
| 6 | March-17 | 43.685 | 13445 Old Highway 67 | Biloxi, Mississippi | PD-R | Residential Subdivision | $600,000 |
| 7 | June-16 | 60.000 | Hudson-Krohn Road | Biloxi, Mississippi | A | Residential Subdivision | $945,000 |

**COMPARABLE SALES MAP**

(L. Appr. at 35). All the sales were "arm's length" sales. (L. Appr. at 36-49). Ladner considered whether to make adjustments to the actual sales prices for the property rights conveyed, financing terms, conditions of sale, expenditures made immediately after purchase, market conditions, location, and other physical characteristics as follows:

### LAND SALES ADJUSTMENT GRID

| | Subject | Sale # 1 | Sale # 2 | Sale # 3 | Sale # 4 | Sale # 5 | Sale # 6 | Sale # 7 |
|---|---|---|---|---|---|---|---|---|
| Sale ID | | 1404920 | 1411509 | 1424019 | 1408202 | 761463 | 1408293 | 761640 |
| Date of Value & Sale | October-19 | May-19 | January-19 | October-17 | June-17 | April-17 | March-17 | June-16 |
| Unadjusted Sales Price | | $525,000 | $200,000 | $230,000 | $668,000 | $625,000 | $600,000 | $945,000 |
| Usable Acres | 129.760 | 20.550 | 11.417 | 13.630 | 26.410 | 17.380 | 43.685 | 60.000 |
| **Unadjusted Sales Price per Usable Acre** | | **$25,547** | **$17,517** | **$16,875** | **$25,293** | **$35,961** | **$13,735** | **$15,750** |
| **Transactional Adjustments** | | | | | | | | |
| Property Rights Conveyed | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Adjusted Sales Price | | $25,547 | $17,517 | $16,875 | $25,293 | $35,961 | $13,735 | $15,750 |
| Financing Terms | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller |
| Adjusted Sales Price | | $25,547 | $17,517 | $16,875 | $25,293 | $35,961 | $13,735 | $15,750 |
| Conditions of Sale | Typical | Arms Length | Arm's Length | Arms Length | Arm's Length | Arms Length | Arm's Length | Arms Length |
| Adjustment | | - | - | - | - | -8.0% | - | - |
| Adjusted Sales Price | | $25,547 | $17,517 | $16,875 | $25,293 | $33,084 | $13,735 | $15,750 |
| **Expenditures after Sale** | | | | | | | | |
| **Adjusted Sales Price** | | **$25,547** | **$17,517** | **$16,875** | **$25,293** | **$33,084** | **$13,735** | **$15,750** |
| **Market Conditions Adjustments** | | | | | | | | |
| Elapsed Time from Date of Value | | 0.43 years | 0.73 years | 2.00 years | 2.35 years | 2.48 years | 2.61 years | 3.34 years |
| Market Trend Through | October-19 | - | - | - | - | - | - | - |
| **Analyzed Sales Price** | | **$25,547** | **$17,517** | **$16,875** | **$25,293** | **$33,084** | **$13,735** | **$15,750** |
| **Physical Adjustments** | | | | | | | | |
| Location | 2000 Beach Drive | South Side of Pass Road at Popps Ferry Road | Old Highway 67 | Money Farm Road | 13151 Old Highway 67 | 17072 Landon Road | 13445 Old Highway 67 | Hudson-Krohn Road |
| | Gulfport, Mississippi | Biloxi, Mississippi | Biloxi, Mississippi | Ocean Springs, Mississippi | Biloxi, Mississippi | Gulfport, Mississippi | Biloxi, Mississippi | Biloxi, Mississippi |
| Adjustment | | - | 20.0% | 20.0% | 20.0% | - | 20.0% | 20.0% |
| Size | 129.760 acres | 20.550 acres | 11.417 acres | 13.630 acres | 26.410 acres | 17.380 acres | 43.685 acres | 60.000 acres |
| Adjustment | | -15.0% | -20.0% | -20.0% | -10.0% | -15.0% | -8.0% | -5.0% |
| Water Influence | Gulf | None | None | None | None | None | None | None |
| Adjustment | | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% |
| Net Physical Adjustment | | 5.0% | 20.0% | 20.0% | 30.0% | 5.0% | 32.0% | 35.0% |
| **Adjusted Sales Price per Usable Acre** | | **$26,825** | **$21,021** | **$20,249** | **$32,881** | **$34,738** | **$18,130** | **$21,263** |

(L. Appr. at 53).

The total net adjustments made to the comparable adjusted sales ranged from five percent (5%) to thirty-five percent (35%) and were based on three (3) different adjustment criteria. (L. Appr. at 53). For comparable sales North of Interstate 10, Ladner increased the sale price by twenty percent (20%). None of the comparable sales had a "water influence," and Ladner adjusted the sale prices an additional twenty percent (20%) upwards. The smaller size of the comparable

sales accounted for downward adjustments. Ladner testified that the comparable properties ranged from five (5) to eight (8) miles in distance from the Subject Property. (Test. of Ladner at 9:30:40-9:33:00 (Jan. 8, 2020)). The comparable properties actually ranged in distance from twelve (12) to fifteen (15) miles, with the exception of Comparable Sale 1, from the Subject Property.[12]  On cross-examination, Ladner explained that selecting the comparable sales as he did increased the Subject Property's valuation because the residential growth in the area is further North. (Test. of Ladner at 9:30:40-9:33:00 (Jan. 8, 2020)). Ladner, however, made multiple adjustments to the comparable sales.

Ladner opined that the per acre value of the Subject Property after adjustments was $29,978.00 per acre for a total of $3,890,000.00. (L. Appr. at 55). Ladner estimated both the marketing and exposure times to be from twelve (12) to twenty-four (24) months. (L. Appr. at 55). Ladner's 2019 Report only included the sales comparison approach. Ladner did not consider the Proposed Plan in preparing the appraisal. (Test. of Ladner at 10:05:35-10:05:42 (Jan. 8, 2020)).

### 3.    The $9,250,000.00 Difference

At the Hearing, Ladner attempted to explain the $9,250,000.00 difference in value between his 2013 and 2019 appraisals. When asked about the purpose of the 2013 appraisal, Ladner stated, "[The Appraisal was] for the club members or owners—we call it prudent management decisions. My understanding was that they were making decisions as to what to do with the property. I think it was used maybe to establish a marketing price. I don't think it was used for accounting purposes but just for their own knowledge—to make prudent management decisions." (Test. of Ladner at

---

[12] The addresses of the comparable sales were provided in Ladner's 2019 Report. (L. Appr. at 35). From Ladner's 2019 Report, the Court was able to calculate the actual distances of the comparable sales from the Subject Property.

9:15:42-9:16:24 (Jan. 8, 2020)). He outlined five (5) factors that purportedly accounted for the $9,250,000.00 decrease in value: (1) the questionable and unknown prospect of beachfront development in 2013; (2) the changed political climate; (3) the Planning Commission and Zoning Board (the "Planning Commission") in the city of Gulfport; (4) the sale history of the Subject Property; and (5) the railroad tracks and other access issues. (Test. of Ladner at 9:56:00-10:03:00 (Jan. 8, 2020)).

Ladner relied first on the uncertainty of the beachfront development in 2013 but in Ladner's 2013 Report stated that the revenue from construction remained higher than pre-Hurricane Katrina levels. (DIP Ex. 2 at 20). In Ladner's 2013 Report, he also mentioned the 2010 British Petroleum oil spill[13] that threatened the Mississippi Gulf Coast but stated that the long-term impact appeared to be minimal. (DIP Ex. 2 at 20). At the Hearing, Ladner did not provide any other evidence of uncertainty at the time of his appraisal in 2013 that would justify the $9,250,000.00 difference in valuation of the Subject Property in 2019. Ladner's second and third factors overlapped and focused on the mayoral change and his opinion that the current members of the Planning Commission are less favorable to development. Ladner did not provide any evidence to support his opinion.

Ladner's fourth factor was the sale history of the Subject Property on the market. Ladner testified that the Subject Property had been on the market for over twelve (12) years without success. The Court did not give Ladner's testimony about the sale history much weight in determining the value of the Subject Property. The Court finds the pre-petition sale process problematic because, according to the DIP, twenty-nine (29) of the Creditor's thirty-eight (38)

---

[13] In April of 2010 a British Petroleum oil rig exploded releasing nearly five (5) million barrels of oil into the Gulf of Mexico. RESTORE THE MISSISSIPPI RIVER DELTA, http://mississippiriverdelta.org/our-coastal-crisis/bp-oil-disaster/ (last visited Jan. 21, 2020).

members are shareholders of the DIP and hold approximately seventy-one percent (71%) of the DIP's total debt.  (Dkt. 75 ¶ 6).  The prepetition realtor listing the Subject Property is a member of the Creditor and a shareholder of the DIP.

Finally, Ladner emphasized the railroad tracks that intersect the Subject Property and the potential access problems the railroad tracks create.  Although the railroad tracks existed in 2013, Ladner testified he was unaware of the potential obstacles that the railroad tracks created but now, because of his better understanding of the Subject Property as a whole, viewed the railroad tracks as creating highly problematic access issues.  (Test. of Ladner at 9:56:00-10:03:00 (Jan. 8, 2020)).

Ladner did not provide any other evidence to explain the substantial change in valuation.  Ladner also did not provide an explanation for the change in his opinion on segmenting the Subject Property for a sales comparison analysis.  In 2013, Ladner divided the Subject Property into three (3) tracts.  Similar to Breland, Ladner segmented the Subject Property and assigned the following values to each distinct tract in Ladner's 2013 Report:

| | |
|---|---|
| Beach Development Parcel (15.00 Acres) | $ 7,840,000 ($12.00/SF) |
| Multi-Family Portion (35.59 Acres) | $ 3,320,000 ($93,300/AC) |
| Single Family Res. Portion (79.17 Acres) | $ 1,980,000 ($25,000/AC) |
| Total | $13,140,000 |

(DIP Ex. 2 at 6).  Although Ladner's 2013 Report was not offered into evidence in its entirety and does not reflect the current value of the Subject Property, it does demonstrate the substantial change in the sales comparison analysis when the Subject Property is considered in distinct tracts as opposed to as a whole.  It also demonstrates that in 2013 Ladner's valuation recognized an approximately $497,667.00 difference in the value of the "Beach Development Parcel" and the "Single Family Res. Portion."  (DIP Ex. 2 at 6).  Ladner's 2019 Report eliminates this distinction in value by valuing the entire 129-acres of the Subject Property at one value.

### B.   Breland's $6,860,000.00 Valuation

Similar to Ladner's 2013 Report, Breland's Report segmented the Subject Property into three (3) tracts.  Breland concluded that the total value of the Subject Property as of December 9, 2019 was $6,860,000.00 as a mixed-use property.  (Test. of Breland at 10:43:50-10:44:08 (Jan. 8, 2020));(B. Appr. at 127).  Breland divided the Subject Property into three (3) different tracts of land based on a "possible conceivable development plan that a typical purchase of the [S]ubject [P]roperty may consider when making a purchase price decision" that also takes into consideration the "least impact" on the surrounding properties.  (Test. of Breland at 10:41:00-10:42:02  (Jan. 8, 2020));(B. Appr. at 56).  Breland classified each tract as either "beach-front development," "multi-family residential," or "single-family residential" and applied a sales comparison approach to the three (3) tracts of land.  (B. Appr. at 63).

### 1.   Beach-Front Development - Tract One

Breland used five (5) comparable sales to determine the value of the 15-acre tract of beach-front development at $1,950,000.00.  (B. Appr. at 80).  The specifications of the five (5) comparable sales are:

| Land Sales Adjustment Grid | | | | | | |
|---|---|---|---|---|---|---|
| | Subject | 1 | 2 | 3 | 4 | 5 |
| Date of Sale | Dec-19 | Sep-19 | Jul-19 | Apr-18 | Apr-18 | Jun-17 |
| Transaction Type | | Sale | Sale | Sale | Sale | Sale |
| Zoning | R-1-7.5 | T4+ & T4L | T4+ & T4L | T4+ & T4L | CB | CB |
| | Residential | Commercial | Commercial | Commercial | Commercial | Commercial |
| Land Size - Acres | 15.00 | 1.09 | 1.33 | 6.90 | 7.70 | 12.01 |
| Land Size - SF | 653,400 | 47,480 | 57,785 | 300,564 | 335,417 | 523,156 |
| Actual Sale Price | | $310,000 | $125,000 | $900,000 | $600,000 | $1,810,000 |
| Adjusted Sale Price | | $310,000 | $125,000 | $900,000 | $600,000 | $1,810,000 |
| Unadjusted Price / AC | | $284,404 | $93,985 | $130,435 | $77,922 | $150,708 |

(B. Appr. at 77).  Breland recognizes that the Subject Property currently is zoned differently than the five (5) comparable properties; however, Breland's Report explains, "Many property owners

of undeveloped parcels fronting US Highway 90 recognize their parcels as commercial; but do not petition for a higher conditional use of zoning change until a contract is in place or plans for development begin." (B. Appr. at 77). Breland continues with the opinion that the "[t]ime and cost to rezone parcels in the area is minimal." (B. Appr. at 77). In determining the value of the beach-front development, Breland made the following adjustments:

| Land Sales Adjustment Grid | | | | | | |
|---|---|---|---|---|---|---|
| | Subject | 1 | 2 | 3 | 4 | 5 |
| Date of Sale | Dec-19 | Sep-19 | Jul-19 | Apr-18 | Apr-18 | Jun-17 |
| Transaction Type | | Sale | Sale | Sale | Sale | Sale |
| Zoning | R-1-7.5 | T4+ & T4L | T4+ & T4L | T4+ & T4L | CB | CB |
| | Residential | Commercial | Commercial | Commercial | Commercial | Commercial |
| Land Size - Acres | 15.00 | 1.09 | 1.33 | 6.90 | 7.70 | 12.01 |
| Land Size - SF | 653,400 | 47,480 | 57,785 | 300,564 | 335,417 | 523,156 |
| Actual Sale Price | | $310,000 | $125,000 | $900,000 | $600,000 | $1,810,000 |
| Adjusted Sale Price | | $310,000 | $125,000 | $900,000 | $600,000 | $1,810,000 |
| Unadjusted Price / AC | | $284,404 | $93,985 | $130,435 | $77,922 | $150,708 |
| Property Rights Conveyed | Fee Simple | - | - | - | - | - |
| Financing Terms | Conventional | | | | | |
| Conditions of Sale | None | - | - | - | - | - |
| Market Cond. Adj. @ | 0.00% | - | - | - | - | - |
| Subtotal Adjusted Price/AC | | $284,404 | $93,985 | $130,435 | $77,922 | $150,708 |
| COMPARISONS | | | | Percentage Adjustments | | |
| Location | East Gulfport | - | - | - | - | - |
| Size (AC) | 15.00 | (20%) | (20%) | (5%) | (5%) | - |
| Shape | Slightly Irregular | - | - | - | - | - |
| Corner | No | (10%) | (10%) | - | - | - |
| Frontage/Access | 1,082 | - | - | - | 10% | - |
| Topography | Slight Slope | - | - | - | - | - |
| Zoning | R-1-7.5 | - | - | - | - | - |
| Utilities | All Available | - | - | - | - | - |
| Flood Zone | X, AE, VE | - | - | - | - | - |
| Other | Other | - | - | - | - | - |
| Overall Physical Adjustments (%) | | (30%) | (30%) | (5%) | 5% | - |
| Value Indication Per AC | | $199,083 | $65,790 | $123,913 | $81,818 | $150,708 |
| Weighting | | 1 | 1 | 1 | 1 | 1 |

| | Adjusted $/AC | |
|---|---|---|
| Value Ranges | Before Adjustment | After Adjustment |
| Minimum Price/AC | $77,922 | $65,790 |
| Maximum Price/AC | $284,404 | $199,083 |
| Mean Average Price/AC | $147,491 | $124,262 |
| Median Price/AC | $130,435 | $123,913 |
| Standard Deviation/AC | $81,776 | $53,661 |
| Weighted Average | | $124,262 |
| Indicated Value | | $130,000 |

(B. Appr. at 80).  Breland adjusted the sale prices based on differences in size, corner placement, and road frontage.  Breland did not adjust for the difference in zoning classification.  After making adjustments to the per-acre values and analyzing the location, size, shape, access frontage, exposure, topography, and other value-influencing factors, Breland valued the beach-front development at $130,000.000 per acre for a total value of $1,950,000.00.[14]  (B. Appr. at 81).

### 2. Multi-Family Residential – Tract Two

Breland also completed a sales comparison analysis on 36.59-acre tract she classified as the multi-family residential portion and concluded that the value of the tract was $2,930,000.00.  (B. Appr. 98).  Breland used the following criteria to find five (5) comparable land sales: vacant parcels that are ready for immediate development, tracts that are suitable for speculative development, parcels that are influenced by their location along or near Highway 90 (Gulf of Mexico), and sale dates ranging from 2013 to the effective date of value.  (B. Appr. 93).  Breland selected five (5) comparables summarized below:

| Land Sales Adjustment Grid | | | | | | |
|---|---|---|---|---|---|---|
| | Subject | 6 | 7 | 8 | 9 | 10 |
| Location | Beach Drive | NKN Cedar Lake | NKN Beach Blvd. | NKN W. Beach Blvd. | NKN Popps Ferry Rd. | 190 Beach Blvd. |
| Date of Sale | Dec-19 | Jul-19 | Oct-18 | Aug-18 | Jul-18 | Oct-13 |
| Transaction Type | | Sale | Sale | Sale | Sale | Sale |
| Zoning | R-2 | RS-7.5 | CB | T4L, T4+, T5C | NB | C-2 |
| | SFR Med-Den | MD Residential | Comm-Bus | Res-Bus | Neigh-Bus | Commercial |
| Land Size - Gross Acres | 36.59 | 8.80 | 22.80 | 5.30 | 5.00 | 10.12 |
| Wetlands | 0.00 | 5.30 | 0.00 | 0.00 | 0.00 | 0.00 |
| Usable Acres | 36.59 | 3.50 | 22.80 | 5.30 | 5.00 | 10.12 |
| Actual Sale Price | | $240,000 | $2,950,000 | $500,000 | $1,500,000 | $900,000 |
| Adjusted Sale Price | | $240,000 | $2,950,000 | $500,000 | $1,500,000 | $900,000 |
| Unadjusted Price / Usable AC | | $68,571 | $129,386 | $94,340 | $300,000 | $88,933 |

(B. Appr. 94).  Breland's primary criteria in selecting the comparable properties was the location, sale date, land size, and similarity of the potential property use to the Subject Property.  (B. Appr.

---

[14] $1,950,000.00=$130,000.00 x 15 acres.

at 94).  Breland explained in her report that dissimilarities existed between the Subject Property and the land comparables; consequently, she made adjustments to the sale price but also factored other differences into the final value estimate.  (B. Appr. at 97).  Breland made the following adjustments to the five (5) comparable sales:

| Land Sales Adjustment Grid | | | | | | |
|---|---|---|---|---|---|---|
| | Subject | 6 | 7 | 8 | 9 | 10 |
| Location | Beach Drive | NKN Cedar Lake | NKN Beach Blvd. | NKN W.  Beach Blvd. | NKN Popps Ferry Rd. | 190 Beach Blvd. |
| Date of Sale | Dec-19 | Jul-19 | Oct-18 | Aug-18 | Jul-18 | Oct-13 |
| Transaction Type | | Sale | Sale | Sale | Sale | Sale |
| Zoning | R-2 | RS-7.5 | CB | T4L, T4+, T5C | N8 | C-2 |
| | SFR Med-Den | MD Residential | Comm-Bus | Res-Bus | Neigh-Bus | Commercial |
| Land Size - Gross Acres | 36.59 | 8.80 | 22.80 | 5.30 | 5.00 | 10.12 |
| Wetlands | 0.00 | 5.30 | 0.00 | 0.00 | 0.00 | 0.00 |
| Usable Acres | 36.59 | 3.50 | 22.80 | 5.30 | 5.00 | 10.12 |
| Actual Sale Price | | $240,000 | $2,950,000 | $500,000 | $1,500,000 | $900,000 |
| Adjusted Sale Price | | $240,000 | $2,950,000 | $500,000 | $1,500,000 | $900,000 |
| Unadjusted Price / Usable AC | | $68,571 | $129,386 | $94,340 | $300,000 | $88,933 |
| Property Rights Conveyed | Fee Simple | - | - | - | - | - |
| Financing Terms | Conventional | | | | | |
| Conditions of Sale | None | - | - | - | - | - |
| Market Cond. Adj. @ | 0.00% | | | | | |
| Adjusted Price / Usable AC | | $68,571 | $129,386 | $94,340 | $300,000 | $88,933 |
| COMPARISONS | | | Percentage Adjustments | | | |
| Location | Suburban | 10% | - | - | 10% | - |
| Size (SF) | 36.59 | (15%) | (5%) | (15%) | (15%) | (10%) |
| Shape | Irregular | (5%) | (5%) | (5%) | (5%) | (5%) |
| Corner | No | (10%) | (10%) | (10%) | - | (10%) |
| Frontage | Interior Roadway | (10%) | (10%) | (15%) | (10%) | (10%) |
| Topography | Basically Level | - | - | - | - | - |
| Zoning | R-2 | - | - | - | - | - |
| Utilities | All Available | - | - | - | - | - |
| Flood Zone | "X" & "AE" | - | - | - | - | - |
| Other | Cleared | 10% | 10% | - | 10% | - |
| Other | Railroad Tracks | (10%) | (10%) | (10%) | (10%) | (10%) |
| Overall Physical Adjustments (%) | | (30%) | (30%) | (55%) | (20%) | (45%) |
| | | | | | | |
| Value Indication Per Usable AC | | $48,000 | $90,570 | $42,453 | $240,000 | $48,913 |
| Weighting | | 1 | 1 | 1 | 1 | 1 |

| Value Ranges | Adjusted $/AC | |
|---|---|---|
| | Before Adjustment | After Adjustment |
| Minimum Price/AC | $68,571 | $42,453 |
| Maximum Price/AC | $300,000 | $240,000 |
| Mean Average Price/AC | $136,246 | $93,987 |
| Median Price/AC | $94,340 | $48,913 |
| Standard Deviation/AC | $94,124 | $83,866 |
| Weighted Average | | $93,987 |
| Indicated Value | $80,000 | |

(B. Appr. at 97).  The five (5) comparable sales produced a wide range of values that were all adjusted downward based on the adjustment criteria.  After adjustments, Breland assigned an

$80,000.00 value per-acre with a total value of the 36.59-acre tract at approximately $2,390,000.00.[15]  (B. Appr. at 98).

### 3.      Single-Family Residential – Tract Three

Breland's final land valuation was of the 78.17-acre tract of land classified as low-density residential.  (B. Appr. at 99).  Breland employed the same sales comparison valuation method to determine that the value of the 78.17-acre tract of land was approximately $1,560,000.00. (B. Appr. at 114).  Breland chose five (5) comparable sales that were all purchased for eventual residential development between March of 2015 and September of 2019.  Breland selected the following five (5) comparable transactions:

| Land Sales Adjustment Grid | | | | | | |
|---|---|---|---|---|---|---|
| | Subject | 11 | 12 | 13 | 14 | 15 |
| Date of Sale | Dec-19 | Sep-19 | Sep-18 | Apr-17 | Jun-16 | Mar-15 |
| Transaction Type | | Sale | Sale | Sale | Sale | Sale |
| Zoning | R-2 | A-2 & C-4 | R-1 | R-1 | A | R-1-15 |
| | SFR Med-Den | Res. & Comm | Residential | Residential | Agricultural | Residential |
| Land Size - Gross Acres | 78.17 | 39.95 | 107.84 | 20.00 | 96.54 | 5.70 |
| Less - Wetlands/Non-Useable | 0.00 | 29.44 | 69.00 | 2.62 | 36.54 | 0.00 |
| Land Size - Useable Acres | 78.17 | 10.51 | 38.84 | 17.38 | 60.00 | 5.70 |
| Actual Sale Price | | $440,000 | $520,000 | $625,000 | $945,000 | $120,000 |
| Adjusted Sale Price | | $440,000 | $500,000 | $575,000 | $945,000 | $120,000 |
| Unadjusted Price / Useable AC | | $41,865 | $12,873 | $33,084 | $15,750 | $21,053 |

(B. Appr. at 110).  In analyzing the values of the comparable properties, Breland adjusted the prices based on location, size, shape, cleared area, and the presence of the railroad track that divides the 78.17-acre tract by the following percentages:

---

[15] $2,927,000.00=$80,000.00 x 36.59 acres.

| Land Sales Adjustment Grid | | | | | | |
|---|---|---|---|---|---|---|
| | Subject | 11 | 12 | 13 | 14 | 15 |
| Date of Sale | Dec-19 | Sep-19 | Sep-18 | Apr-17 | Jun-16 | Mar-15 |
| Transaction Type | | Sale | Sale | Sale | Sale | Sale |
| Zoning | R-2 | A-2 & C-4 | R-1 | R-1 | A | R-1-15 |
| | SFR Med-Den | Res. & Comm | Residential | Residential | Agricultural | Residential |
| Land Size - Gross Acres | 78.17 | 39.95 | 107.84 | 20.00 | 96.54 | 5.70 |
| Less - Wetlands/Non-Useable | 0.00 | 29.44 | 69.00 | 2.62 | 36.54 | 0.00 |
| Land Size - Useable Acres | 78.17 | 10.51 | 38.84 | 17.38 | 60.00 | 5.70 |
| Actual Sale Price | | $440,000 | $520,000 | $625,000 | $945,000 | $120,000 |
| Adjusted Sale Price | | $440,000 | $500,000 | $575,000 | $945,000 | $120,000 |
| Unadjusted Price / Useable AC | | $41,865 | $12,873 | $33,084 | $15,750 | $21,053 |
| Property Rights Conveyed | Fee Simple | - | - | - | - | - |
| Financing Terms | Conventional | - | - | - | - | - |
| Conditions of Sale | None | - | - | - | - | - |
| Market Cond. Adj. @ | 0.00% | - | - | - | - | - |
| Subtotal Adjusted Price/AC | | $41,865 | $12,873 | $33,084 | $15,750 | $21,053 |
| COMPARISONS | | Percentage Adjustments | | | | |
| Location | Suburban | 10% | 10% | 10% | 10% | 10% |
| Size (AC) | 78.17 | (25%) | (10%) | (20%) | - | (30%) |
| Shape | Irregular | (5%) | - | (5%) | - | (5%) |
| Wetland | Adjusted | - | - | - | - | - |
| Road Frontage | Various | - | - | - | - | - |
| Water Frontage | None | - | - | - | - | - |
| Topography | Basically Level | - | - | - | - | - |
| Cleared Area | Miminal | 10% | 10% | - | 5% | 5% |
| Zoning | R-2 | - | - | - | - | - |
| Utilities | Public | - | - | - | - | - |
| Flood Zone | "X" & "AE" | - | - | - | - | - |
| Other | Railroad Tracks | (5%) | (5%) | (10%) | (10%) | (10%) |
| Overall Physical Adjustments (%) | | (15%) | 5% | (25%) | 5% | (30%) |
| Value Indication Per AC | | $35,585 | $13,517 | $24,813 | $16,538 | $14,737 |
| Weighting | | 1 | 2 | 1 | 3 | 1 |

| | Adjusted $/AC | |
|---|---|---|
| Value Ranges | Before Adjustment | After Adjustment |
| Minimum Price/AC | $12,873 | $13,517 |
| Maximum Price/AC | $41,865 | $35,585 |
| Mean Average Price/AC | $24,925 | $21,038 |
| Median Price/AC | $21,053 | $16,538 |
| Standard Deviation/AC | $12,227 | $9,262 |
| Weighted Average | | $18,973 |
| Indicated Value | $20,000 | |

(B. Appr. at 113). Breland adjusted comparables 13, 14, and 15 downward by ten percent (10%) to account for the absence of any sort of easement encumbrance dividing the property and adjusted

comparables 11 and 12 downward by only five percent (5%) because both of those properties are divided by an easement, a powerline and canal easement, respectively. (B. Appr. at 112). Through her analysis, Breland valued the 78.17-acre tract of low-density residential land at $20,000.00 per acre for a total of approximately $1,560,000.00.[16]  (B. Appr. at 114).

### 4.       Tracts One, Two, and Three and Improvements

Breland concluded that the estimated land value, without improvements, of the three (3) tracts of land is $6,440,000.00.[17]  (B. Appr. at 115). Breland found that the average price per acre of the total 129.76-acre tract of land is $49,630.00. (B. Appr. at 115). Breland then valued the existing improvements on the land using a sales comparison approach at $420,000.00. (B. Appr. at 118).

The Court found Breland's testimony on cross-examination with respect to the existing improvements on the Subject Property and her total valuation confusing. At the beginning of Breland's Report, she concluded that "the highest and best use of the subject property is to raze and remove the existing improvements and improve the property to its highest and best use, as if vacant." (B. Appr. at 55). On cross-examination, Breland clarified that her statement that "the highest and best use of the subject property is to raze and remove the existing improvements and improve the property to its highest and best use" only referred to the golf course, not the existing buildings. (Test. of Breland at 11:05:00-11:06:20 (Jan. 8, 2020)).

---

[16] $1,563,400=$20,000.00 x 78.17 acres.

[17] $6,440,000.00=$1,950,000.00 (Tract One) + $2,930,000.00 (Tract Two) + $1,560,000.00 (Tract Three).

Despite Breland's clarification, she still valued the existing building improvements[18] and site improvements[19] at $420,000.00 and added the value to the total land valuation of $6,440,000.00 to reach a total valuation of $6,860,000.00.  (B. Appr. at 120).  To achieve the $6,440,000.00 figure required the use of one-hundred percent (100%) of the 129.76-acre tract. (Test. of Breland at 11:08:53-11:09:00 (Jan. 8, 2020)).  Breland previously testified that the purpose in considering some of the qualitative rather than quantifiable attributes of the improvements on the Subject Property was to evaluate possible development plans while weighing the "least impact" on the surrounding properties.  (Test. of Breland at 10:41:00-10:42:02, 10:34:37-10:44:19  (Jan. 8, 2020)).  For example, a restaurant exists on the Subject Property and a potential purchaser would not have to request rezoning to utilize the restaurant on the Subject Property as long as any changes to the building did not exceed fifty percent (50%) of the value of the existing building.  (Test. of Breland at 11:28:30-11:29:08 (Jan. 8, 2020)).

### Discussion

Section 362(a) of the Bankruptcy Code provides that upon the filing of a bankruptcy petition, a secured creditor is automatically stayed from acting to obtain possession or to exercise control over property of the debtor's estate.  *See* 11 U.S.C. § 362(a)(3).  However, § 362(d) of the Bankruptcy Code allows a court to grant relief from the automatic stay.  Section 362(d)(2) of the Bankruptcy Code provides:

---

[18] The existing building improvements include: a 3,323 square-foot clubhouse, a 976 square-foot covered area attached to the clubhouse, a 3,570 square-foot warehouse, a 3,570 square-foot storage mezzanine, 2,427 square feet of additional covered areas, and 310 square-feet of outbuildings.  (B. Appr. at 118-19).

[19] The site improvements include site preparation, fencing, gates, landscaping, graveled areas, and lighting.  (B. Appr. at 120).

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> * * *
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>
> > (A) the debtor does not have equity in such property; and
> >
> > (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2).  Section 362(d)(2) is written in the conjunctive; both (A) and (B) must be satisfied before a court may grant relief from the automatic stay under this subsection.  *In re R & G Props., Inc.*, Case No. 08-10876, 2009 WL 1076703, at *8 (Bankr. D. Vt. April 16, 2009).

As provided in § 362(g) of the Bankruptcy Code, the party opposing relief from the stay has the burden of proof on all issues other than the issue of the debtor's equity in the property.  11 U.S.C. § 362(g); *see Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990) ("Section 362(g) places the burden of proof on the debtor for all issues other than the debtor's equity in the property." (internal quotation omitted)); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1015 (Bankr. S.D.N.Y. 1993), *aff'd*, No. 93 Civ. 844, 1993 WL 316183 (S.D.N.Y. May 21, 1993).  The United States Supreme Court held that once a creditor establishes that a debtor has no equity in a property, "it is the burden of the debtor to establish that the collateral at issue is necessary to an effective reorganization."  *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988) (internal quotations & citation omitted).

The Court first determines if the Creditor met its burden to prove that the DIP lacked equity in the Subject Property.  In an effort to narrow the issues before the Court, the parties offered into evidence the Stipulation.  The Stipulation calculated the principal amounts, interests, and fees of

the Hill Deed of Trust and the Creditor Deed of Trust as of November 26, 2019.  (Stipulation ¶¶ 12-15).  A stipulation will ordinarily be binding absent fraud, mistake, improvidence, a material change in circumstances, or if equitable considerations require relief.  *In re Garcia*, 434 B.R. 638, 641 (Bankr. D.N.M. 2010).  The Court accepts the facts presented in the Stipulation only for purposes of determining relief from the automatic stay under § 362(d)(2).  Therefore, as stipulated, the Subject Property is encumbered by a debt of $4,242,034.59 as of November 26, 2019 with interest and attorney fees continuing to accrue.[20]

Bankruptcy courts face an open-ended directive to determine value "in light of the purpose of the valuation and of the proposed disposition or use of such property."  *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 1885 (1997); 11 U.S.C. § 506(a)(1).[21]  The court first must make a determination on the purpose of the valuation in light of the property's proposed use or disposition. 4 COLLIER ON BANKRUPTCY ¶ 506.03[7] (16th ed. 2019).  "One of the prime purposes of reorganization in a chapter 11 case is to avoid, if feasible, the value shortfalls that often result from liquidating the debtor's assets piecemeal at foreclosure sales instead of capturing any higher going concern value of the debtor's business."  4 COLLIER ON BANKRUPTCY ¶ 506.03[7][b][ii] (16th ed. 2019).

---

[20] The accrual of allowable postpetition interest, fees, costs and charges may have the effect of reducing or eliminating the DIP's equity to the point that relief from the stay should be granted. 4 COLLIER ON BANKRUPTCY ¶ 506.03[7][f], [10] (16th ed. 2019).  The parties did not present evidence or arguments that the Court should consider or calculate a different amount.  At this early stage, the Court does not find that making a determination otherwise would result in an appreciable difference in the calculation.

[21] Section 506(a) is relevant in demonstrating a party's entitlement to relief from the automatic stay under § 362(d) due to the absence of equity in the collateral. 4 COLLIER ON BANKRUPTCY ¶ 506.03[4][a] (16th ed. 2019); *see Farmers & Merchant's Bank v. Southall*, 475 B.R. 274 (M.D. Ga. 2012); 4 COLLIER ON BANKRUPTCY ¶ 506.03[6][c] (16th ed. 2019).

Generally, selecting the debtor's proposed use, if realistic, mirrors the purpose of § 362(d)(2)(A) for determining the equity question. 4 COLLIER ON BANKRUPTCY ¶ 506.03[7][b][ii] (16th ed. 2019). In *Southall,* the district court affirmed the bankruptcy court's refusal to give the bank's appraiser's testimony any weight when the appraiser valued farmland at its highest and best use as vacant development land instead of as farmland in accordance with "the proposed disposition and use" of the property. *Southall,* 475 B.R. at 278. The Court also must take into consideration the debtor's prospect for actually accomplishing the proposed disposition, the extent that the debtor's proposal jeopardizes the secured creditor's interests, and the costs associated with the proposed disposition. *Id.*

The DIP's Proposed Plan provides a twelve (12)-month period to pursue both a sale of all or a portion of the Subject Property and/or to continue to persuade interested investor groups to cover its obligation to the Creditor. Ladner's valuation only considered a sale of the Subject Property as single-family residential property. Ladner testified he considered, but did not incorporate, any other proposed use or disposition of the Subject Property. In fact, Ladner testified that he had not read the Proposed Plan. (Test. of Ladner at 10:05:35-10:05:42 (Jan. 8, 2020)). This Court still considered Ladner's 2019 Report and Ladner's testimony in making its decision but put little weight in the final figure that valued all 129-acres at the same value as single-family residential properties.

The Court also was not convinced by Ladner's testimony attempting to justify the change in his approach from the 2013 valuation to the 2019 valuation. In Ladner's 2013 Report, he employed a valuation analysis that more closely aligned with the use and disposition outlined in the Proposed Plan. Like Breland's Report, in 2013 Ladner segmented the Subject Property and made a determination of the value on each of the three (3) tracts. The substantial difference in the

per acre value of the beach-front development of the Subject Property and the single-family residential portion of the Subject Property in Ladner's 2013 Report and Breland's Report weighed against Ladner's 2019 valuation. The Court was not convinced that the change in Ladner's approach to a sales comparison analysis, which was mostly responsible for the substantial difference in Ladner's two valuations, was justified by the provided evidence or explanation.

The Court also considered the value shortfalls that often result from liquidating assets piecemeal at foreclosure sales instead of capturing any higher going-concern value. Ladner's valuation did not appear to consider this scenario. Ladner's twelve (12) to twenty-four (24) month exposure and market times would leave the Subject Property likely without funds or personnel to maintain the Subject Property if it was foreclosed. The DIP, however, is able to produce income through the operation of the business that covers the operating expenses and maximizes the value of the Subject Property by maintaining the grounds and improvements, preserving the golf course, and operating the clubhouse for whatever use a buyer might want while preserving the possible zoning exception. Many of these benefits of the Proposed Plan conceivably would be lost if the Creditor were to foreclose now. Ladner's disregard for the disposition and use of the Subject Property in the Proposed Plan, and the potential benefits of moving forward with confirmation, convinced the Court to put little weight on Ladner's 2019 Report and testimony in deciding if the Creditor met its burden.

The valuation of assets is not an exact science. *In re Brown*, 289 B.R. 235, 238 (Bankr. M.D. Fla. 2003). Bankruptcy courts determine valuation questions by considering the purpose of the valuation and reviewing the facts and circumstances of each case. *In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 799. Importantly, "[t]he bankruptcy court is not bound by valuation opinions or reports submitted by appraisers, and may form its own opinion as to the value of property in

bankruptcy proceedings." *In re The Grind Coffee & Nosh, LLC*, No. 11-50011-KMS, 2011 WL 1301357, at *6 (Bankr. S.D. Miss. Apr. 4, 2011). Courts may pick and choose between the methods used by each appraiser, effectively recomputing the valuation formula using their preferred metrics as the inputs. *See In re TIAT Corp.*, No. 16-10764, 2017 WL 161675 (Bankr. D. Kan. Jan. 13, 2017). Other courts adopt the value set forth in the appraisal that they find more persuasive, rejecting the competing appraisal entirely. *See In re Mt. Laurel Lodging Assocs., LLP*, No. 13-11697-RLM-11, 2014 WL 1576971 (Bankr. S.D. Ind. Apr. 18, 2014). Some courts evaluate each appraisal on its merits in order to determine how much relative weight to accord each opinion of value, usually ending up with a value figure somewhere in the middle. *See 2010 Ludlow St. Corp. v. Wells Fargo Bank, N.A. (In re 210 Ludlow St. Corp.)*, 455 B.R. 443 (Bankr. W.D. Pa. 2011).

Courts have defined equity as "the difference between the property value and the total amount of liens against it." *Stewart v. Gurley*, 745 F.2d 1194, 1195 (9th Cir. 1984); *In re Garsal Realty, Inc.*, 98 B.R. 140, 154 (Bankr. N.D.N.Y. 1989) (Equity is "the remaining interest belonging to one who pledged or mortgaged his property, or the surplus value which may remain after the property has been disposed of for the satisfaction of liens." (internal citations omitted)). Courts agree that all liens against an encumbered property should be included in determining whether the debtor has equity in property under § 362(d)(2)(A). 3 COLLIER ON BANKRUPTCY ¶ 362.07[4] (16th ed. 2019); *see In re SW Boston Hotel Venture LLC*, 449 B.R. 156, 177 (Bankr. D. Mass. 2011); *Stewart*, 745 F.2d at 1195.

In making its determination with respect to valuation, a court should "sift through the appraisal and testimony and make a judgment as to the 'accuracy and credibility' of the appraisers." *In re Whitney Lane Holdings, LLC*, No. 09-72076-478, 2009 WL 2045700, at *2

(Bankr. E.D.N.Y. July 6, 2009); *see In re Miami Beach Hotel Investors LLC*, 304 B.R. 532, 535, n.4 (Bankr. S.D. Fla. 2004). Appraisers are called upon to use the best statistics and facts in presenting valuations, and courts must examine the reasonableness of financial assumption used by appraisers. *See In re Carmania Corp. N.V.*, 156 B.R. 119, 121 (Bankr. S.D.N.Y. 1993).

The Creditor bore the burden of proof in demonstrating to the Court that the DIP lacked equity in the Subject Property. Ladner's sales comparison analysis valued the Subject Property at $3,890,000.00. The valuation was only roughly $352,000.00 less than the $4,242,034.59 debt on the Subject Property. The Court is not convinced that the valuation's $352,000.00 shortfall is not covered by the flawed decision to value the entire 129.76-acre tract of the Subject Property, including the most valuable 15-acre tract of beachfront property, at $29,978.00 per acre. In Ladner's 2013 Report, he valued the 15-acre tract of beachfront property at roughly $522,667.00 per acre, and Breland's Report valued the 15-acre tract of beachfront property at $130,000.00 per acre. Both valuations of the 15-acre tract are substantially higher than Ladner's $29,978.00 figure and would easily cover the shortfall. While the front part of the Subject Property is more valuable, Ladner testified that segmenting the Subject Property to value or sell it in multiple tracts would devalue the remaining acreage, an issue he either did not raise or did not consider in 2013. (Test. of Ladner at 9:49:45-9:52:08 (Jan. 8, 2020)). Ladner did not provide any further explanation for his change in opinion about segmenting the Subject Property for purposes of valuation.

As previously discussed, the Court was not convinced by Ladner's explanation for the $9,250,000.00 difference in the valuation he prepared for the DIP in 2013 and the valuation he prepared for the Creditor in 2019. The Court heavily weighed the impact that valuing the entire 129.76-acre tract at a single price per acre—as opposed to segmenting the more valuable beachfront property—had on the valuation. Ladner also did not convince the Court that the

railroad tracks and potential access issues that were allegedly unknown, not of issue, or not considered in his 2013 valuation suddenly became a substantial detriment to the value of the Subject Property.  Although Ladner adjusted the comparable sales to account for the differences with the Subject Property, the impact on value was compounded by the distance of the comparable sales from the Subject Property.

After hearing the testimony and reviewing the appraisal reports of both experts, the Court's decision relied heavily on its analysis of the amount in controversy to determine equity and its understanding of the disputed evidence.  The cross-examination of Breland included questions and criticism of her valuation of the beachfront development land at $1,950,000.00 and the value of existing improvements at $420,000.00.  The Court did not find that Breland's $420,000.00 improvement value impacted the $6,440,000.00 land valuation.  However, the Court is not convinced that including the $420,000.00 improvement value to the $6,440,000.00 land valuation would not artificially inflate the valuation of the Subject Property.  The Court, therefore, did not include the value of the existing building and site improvements in its analysis.

In making its decision, the Court found that even assigning a zero value to the beachfront development land and the existing improvements, according to Breland's Report, the value of the other land alone—the multi-family residential portion and the low-density residential portion—would support a finding that there is equity in the Subject Property with $4,490,000.00 in combined value compared to $4,242,034.59 in combined debt.  (Stipulation ¶¶ 12-15).  Obviously, the value of the beachfront development, which was also the most valuable tract in Ladner's 2013 Report and what Ladner called the best part of the Subject Property, is more than enough to account for any over valuation of the two other tracts or an increase in the debt.

**Conclusion**

At the Hearing, the Court held that the Creditor did not meet its burden in proving that the DIP lacked equity in the Subject Property. The unique nature of the Subject Property and ongoing efforts to sell the Subject Property for the highest price convinced the Court not to speculate as to the specific value of the Subject Property. The Court found that while Breland's $6,860,000.00 valuation may have been too high, Ladner's $3,890,000.00 was unjustifiably low. The Court was convinced that the actual value of the Subject Property was closer to Breland's valuation based on her holistic approach to valuing the Subject Property. Ultimately, the Court held that the value of the Subject Property was greater than the stipulated $4,242,034.59 of encumbrances. Having held that the DIP has equity in the Subject Property, the Court did not address the second prong of § 362(d)(2) regarding the necessity of the Subject Property to an effective reorganization. Going forward post-petition, the parties will have disinterested sale professionals marketing the Subject Property, with the DIP who owes a fiduciary duty to act in the estate's best interest. (Dkt. 51).

IT IS, THEREFORE, ORDERED that the Stay Motion is hereby denied.

##END OF OPINION##